**Electronically Filed
Supreme Court
SCWC-12-0000020
30-SEP-2016
01:01 PM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

STATE OF HAWAIʻI,
Petitioner/Plaintiff-Appellee,

vs.

LINCOLN PHILLIPS,
Respondent/Defendant-Appellant.

SCWC-12-0000020

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-12-0000020; CR. NO. 08-1-1430)

SEPTEMBER 30, 2016

McKENNA AND POLLACK, JJ., AND CIRCUIT JUDGE NISHIMURA, IN PLACE
OF ACOBA, J., RECUSED, AND NAKAYAMA, J., CONCURRING AND
DISSENTING, WITH WHOM RECKTENWALD, C.J., JOINS

OPINION OF THE COURT BY POLLACK, J.

## I.    INTRODUCTION

The Intermediate Court of Appeals (ICA) vacated the
conviction of Lincoln Phillips for the attempted murder of his
wife Tara Phillips and remanded the case for a new trial.  In
reaching this result, the ICA adopted an interpretation of the

plain view doctrine that is contrary to this court's prior decisions and the protections and limits of the rights guaranteed under Article I, Section 7 of the Hawai'i Constitution. A proper application of these principles requires the reversal of the ICA's judgment on appeal and affirmance of the trial court's amended judgment of conviction.

## II.    BACKGROUND

### A.    Initial investigation

In the early morning of September 3, 2008, police dispatch received a call from Lincoln Phillips summoning police to his home. Phillips told the operator that "when he came home he found injuries to his wife's head." Honolulu Fire Department (HFD) personnel, emergency medical technicians (EMT), and Officer Stanley Collins of the Honolulu Police Department (HPD) were the earliest first responders to arrive at Phillips' house.

HPD Officer Collins received the dispatch at about 3:54 a.m. The officer "had no idea" of the identity of the victim or suspect. When Officer Collins arrived at the residence, he saw Phillips "in his garage area." According to Officer Collins, Phillips seemed frantic and was "motioning [him] to come forward" into the "garage area." Officer Collins understood the motioning to be "inviting me" and as an indication that "this is the place you should come, this is the

place you should be."[1]  Upon entering the garage, Officer Collins asked Phillips what happened.  Phillips responded, "It's my wife, it's my wife," and informed Officer Collins that his wife, Tara Phillips (Tara), was upstairs in the bedroom.  While Phillips remained in the garage area, Officer Collins went upstairs and saw Tara lying on a bed being attended by members of the HFD.  After spending "maybe a few seconds" upstairs, Officer Collins returned to the garage, where Phillips had remained, and Officer Collins "made contact with Phillips and tried to get him calm."

HPD Officer Robert Frank arrived at approximately 4:03 a.m. and joined Officer Collins and Phillips in the garage. Officer Frank noted that Phillips "was sweating profusely, pacing back and forth."  Phillips told the officers that "he couldn't sleep.  So he got in his car, drove to the beach[] then [to] the park at the end of Fort Weaver Road, [and] stopped at 7 Eleven."  When he "arrived home, [he] went upstairs and . . . found his wife bleeding from her head."

Officer Collins "tried to get [Phillips] calm" by opening the door of Tara's vehicle and having him sit in the

---

[1]     From this testimony, there is the clear indication that the garage door was open when Officer Collins arrived.  The fact that the garage door was open when the police arrived is supported by Officer Collins' testimony that Phillips told him "[t]hat he had left to go get something and when he returned home he found his garage door opened", and by trial testimony of an EMT that when he arrived at the scene "[i]nitially we seen [sic] the garage open."

passenger seat. Officer Collins asked him what happened, and Phillips explained that "when he went upstairs initially he sat on the futon" and "the lights were out." "When he heard his wife having difficulty breathing that's when he turned on the lights and discovered her injuries."

Phillips said that the garage door was closed when he drove off early that morning and open when he returned home. Phillips explained that the garage door was defective: "it would close with the remote, but it would not open with the remote." Phillips demonstrated the garage door remote to show the officers that it was defective. Phillips closed the garage door with the remote, and the officers "had to open it from the inside panel of the garage" with a wall switch.

HPD Sergeant (Sgt.) Lloyd Keliinui arrived at Phillips' residence at approximately 4:00 a.m. Sgt. Keliinui was told by other officers that Phillips had come home and had "found out that his wife had been assaulted." Based on the information that "somebody came in" to the home, Sgt. Keliinui was concerned that there was "somebody out there unidentified, possibly roaming the neighborhood, with some kind of weapon." Sgt. Keliinui "instructed some of the initial officers to canvas the area" and to "check for possible suspects or witnesses" and evidence.

HPD Officer John Tokunaga arrived at approximately 4:12 a.m.  Sgt. Keliinui instructed him to "check the area" "in the immediate vicinity of the residence" "for possible weapons that may have been used."  Sgt. Keliinui did not inform Officer Tokunaga of the general facts of the case.  Officer Tokunaga did not know "what kind of possible weapons [he] was looking for."  He was looking for any "possible evidence that may have been related to the victim's injuries."  He was not aware of "anyone in particular [that was] a suspect."  Officer Tokunaga did not find any weapon or other possible evidence that may have been related to Tara's injuries outside of the residence.

Sometime before 4:30 a.m., Officer Tokunaga observed a hammer "on a cooler" inside the garage, "on the left side of the garage as you enter."  Officer Tokunaga "believe[d] there was a spot of blood on top of the hammer," which indicated that it was a "possible weapon."  Officer Tokunaga also observed "water on the handle area of the hammer" but not on the coolers.  At the time Officer Tokunaga observed the hammer, Officers Frank and Collins were also in the garage with Phillips.  Officer Tokunaga informed Sgt. Keliinui and Officer Corrine Rivera about the hammer that he had found.

During the initial investigation, Phillips' garage served as an impromptu center for the police response.  Officer Collins was "going back and forth" from the garage, trying to

keep Phillips "calm"; "EMS [was] arriving, and the sector sergeant [was] arriving"; and Officer Ahn was with Phillips in the garage. HPD officers "were coming in and out" of the garage, and "there was a lot of commotion going on because the garage had kind of been the central place of the investigation."

At some point during the "initial check of the residence" by the police, Officer Frank blew his nose into a napkin and "discarded it in the garbage can" that was "in the garage."[2] Officer Frank lifted the lid of the garbage container "about 45 degrees" to discard the napkin, and observed rolled up mesh clothing among discarded food boxes inside the garbage container. The clothes were "just sitting in the garbage container," "on the same level" of the food boxes. Officer Frank did not "disturb the contents of that trash can at all." Because the clothing "was rolled up," Officer Frank did not notice anything unusual about the clothes. Officer Frank informed Sgt. Keliinui about the clothing "when [he] got the chance to see him."

HPD Officer Dennis Ahn arrived at approximately 4:30 a.m. and entered the open garage where he observed Officer Collins, Sgt. Keliinui, and Phillips. Officer Collins

---

[2] Although not precisely described by the parties, photographs in the record indicate that the "garbage can" is a common plastic garbage container, apparently a 32-gallon variety.

instructed Officer Ahn to stay with Phillips, who "was the only witness at the time." Officer Ahn was assigned to watch Phillips and help him "to just remain calm, and just to stay put until a detective would come and get a statement from him." Later, Officer Ahn asked Phillips to move into the living room so that he would be more comfortable and could see Tara as she was being carried out, and because he was "obstructing the walkway between walking in the garage and into the home."

At approximately 5:15 a.m., Officer Ahn asked Phillips to accompany him "to the Kapolei station, because a detective would like to get his statement." Officer Ahn informed Phillips "that he was not under arrest." "Phillips was very cooperative. And he said yes." Officer Ahn and Phillips arrived at the Kapolei Police Station at approximately 5:30 a.m. where Phillips was interviewed later that morning. At the end of the interview, Phillips "just want[ed] to go see [his] wife," and he was permitted to leave the station.

At approximately 6:05 a.m., Evidence Specialist Jasmina Eliza from the HPD Scientific Investigation Section arrived at Phillips' home. She was directed to photograph and recover the hammer. Specialist Eliza recovered the hammer at approximately 9:35 a.m. At the same time, she also recovered a man's shirt as well as a man's pants from the trash can located in the garage.

At 12:25 p.m., HPD Detective Sheryl Sunia prepared an Affidavit in Support of a Search Warrant (Affidavit). In her Affidavit, Sunia requested a warrant allowing a search of, inter alia, Phillips' residence and car, along with receptacles, bags, and containers found within.[3]

Upon a finding that there was probable cause to believe that "evidence of Attempted Murder in the Second Degree . . . and/or Burglary in the First Degree" was present, a district court judge issued a search warrant for Phillips' car and residence and "all closed compartments and/or containers" therein at approximately 7:45 p.m. that evening. Among other items, the warrant allowed HPD officers to search Phillips' residence for "[a] plastic garbage can, including its contents, located in the enclosed garage" as well as "all items of evidence, including, but not limited to . . . articles of clothing . . . [and] tools."

## B. Circuit Court

On September 10, 2008, Phillips was indicted on the charge of attempted murder in the second degree in violation of Hawai'i Revised Statutes (HRS) §§ 705-500,[4] 707-701.5,[5] and 706-

---

[3]    A detailed summary of the factual assertions made in Sunia's Affidavit is set forth in the Discussion section, see infra Part III.C.

[4]    HRS § 705-500 (1993) states in relevant part the following:

(. . .continued)

656.[6]  Phillips pleaded not guilty to the charge on September 15, 2008, in the Circuit Court of the First Circuit (circuit court).

### 1. Motion to Suppress

On April 24, 2009, Phillips filed a Motion to Suppress Evidence and Statements (motion).[7]  Phillips sought to suppress

---

(. . .continued)

    (1) A person is guilty of an attempt to commit a crime if the person:(a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be; or
    (b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.
    (2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

[5]    HRS § 707-701.5 (1993) states as follows:

    (1) Except as provided in section 707-701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.
    (2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706-656.

[6]    HRS § 706-656 (Supp. 1996) states in relevant part as follows:

    (1) Persons eighteen years of age or over at the time of the offense who are convicted of first degree murder or first degree attempted murder shall be sentenced to life imprisonment without the possibility of parole.
. . . .
    (2) Except as provided in section 706-657, pertaining to enhanced sentence for second degree murder, persons convicted of second degree murder and attempted second degree murder shall be sentenced to life imprisonment with possibility of parole. The minimum length of imprisonment shall be determined by the Hawaii paroling authority; provided that persons who are repeat offenders under section 706-606.5 shall serve at least the applicable mandatory minimum term of imprisonment.

[7]    The Honorable Karen S.S. Ahn presided over the hearing on the motion and the subsequent trial.

from admission into evidence the hammer recovered from his garage and a gray "men's shirt with orange piping and gray men's shorts with blue lateral stripes," recovered from a trash can located in his garage. Phillips asserted that the hammer and the clothing "were recovered without consent and without a warrant," in violation of his state and federal constitutional rights.

In his argument to the court on the motion, defense counsel acknowledged that "the hammer's in plain view, there's no dispute about that," but argued that the HPD could not seize the hammer absent "exigent circumstances for the warrantless seizure." Regarding the clothing, defense counsel argued that "whether or not . . . [it] was discovered inadvertently or was in plain view," there was both "a search and a seizure problem," particularly in light of the clothing being included as a basis for the search warrant.

The State asserted that "[h]aving invited the police into his home to investigate a possible crime," Phillips at best only had "a diminished privacy right" and, hence, could not complain "that the police were unlawfully in his home." According to the State, it was "uncontroverted" that the hammer was discovered in plain view and that "the case law is clear," under State v. Jenkins, 93 Hawai'i 87, 997 P.2d 13 (2000), that if "an item is in plain view, [seizure] doesn't violate a

person's right[s]." The State argued that the clothes were admissible because "there was no search" when Officer Frank "opened the trash can," threw the napkin in, and "saw the clothes" in "plain view." The State maintained that, in the alternative, even if Officer Frank's actions did constitute a search, the clothing was still admissible under the doctrine of inevitable discovery. The State further contended that even without the clothing, there was still probable cause for the search warrant because the "fact that a crime was committed in the house [was alone] enough for the search warrant."

On December 29, 2009, the circuit court issued its "Findings of Facts, Conclusions of Law, and Order Granting in Part and Denying in Part Defendant's Motion to Suppress Evidence and Statements." Regarding the hammer, the circuit court found that when Officer Tokunaga was assigned to look for weapons, he "knew no other facts and had no suspects in mind." The court concluded that Officer Tokunaga was "engaged in a lawful intrusion" when he "inadvertently observe[d]" the hammer. Because the blood on the hammer gave Officer Tokunaga probable cause to believe it was evidence of a crime, the hammer was lawfully seized under the plain view doctrine.

Additionally, the circuit court concluded that the State had "carried its burden to show by clear and convincing evidence that the clothing found within the covered trash

container in the garage would inevitably have been discovered by lawful means" under the search warrant later obtained. The court reasoned that the search warrant was not constitutionally defective because "notwithstanding the search warrant affidavit['s] reliance, in part, upon statements and items illegally obtained, the affidavit[] absent those statements and items contained sufficient basis upon which a district court judge could find probable cause to search for all items enumerated."

The motion was therefore denied as to the hammer and clothing discovered in Phillips' garage. The court granted the motion, in part, with respect to certain statements Phillips made to HPD officers.

## 2. The Trial

The hammer and the clothing recovered from the garbage container were received into evidence at trial. Officer Frank identified his discarded tissue in State's Exhibit 15, a photograph of the garbage can showing the appearance of the interior of the container when Officer Frank lifted its lid on the morning of September 3, 2008. Police witnesses provided testimony that Phillips had stated that he had placed the hammer "where it was found." A witness stated that he saw Phillips wearing the clothing found in the garbage container the day before the assault. An expert witness identified the red

substance on the hammer and on the T-shirt as Tara's blood through DNA analysis.

In regard to Tara's injuries, Dr. Cherylee Chang testified that Tara arrived at the hospital on the day of the attack in a coma. Tara was "unresponsive, not opening her eyes," and had no motor response. Tara's principal injury was a large laceration over the right side of her head. According to Dr. Chang, Tara was "at imminent risk of death" because of significant brain injuries; if she had not received emergency medical treatment, she would have died "in the field." In order to save her life, Tara was placed into a medically induced coma.

Tara's mother testified that Tara was in the hospital in Honolulu for four months before being transferred to a Veterans Affairs (VA) hospital near Tampa, Florida. At the time Tara left Hawai'i, Dr. Chang felt that Tara "was in such bad neurologic condition that it looked like she would be bed bound." Tara's mother testified that Tara was never able to live on her own after the attack and that she never regained any memory of her attack. Tara died in the Tampa, Florida VA hospital on April 19, 2010.[8]

_____

[8] The record does not contain any information regarding a discharge from the Florida VA Hospital or indicate that Tara was cared for at home or with a family member; as noted above, Tara's mother testified that Tara died in the Florida VA hospital. There is, however, a potential inference from the record that Tara was discharged from the Florida VA hospital four months

(. . .continued)

The parties stipulated during trial that Tara's "death was unrelated to the September 3, 2008 attack."  Phillips elected not to testify.  In closing argument, Phillips' counsel argued that there was insufficient evidence to convict Phillips of the charged offense.

On June 16, 2011, the jury found Phillips guilty of attempted murder in the second degree.  On August 29, 2011, the Judgment of Conviction and Sentence was issued by the circuit court, sentencing Phillips to life imprisonment with the possibility of parole, with restitution to be determined at a subsequent proceeding.

At the restitution hearing, the State requested that Tara's mother be reimbursed for funeral and related expenses of $6,530.  Phillips argued that he should not be liable for any additional payment because he had made "very large payments for a couple years to" Tara's mother; Tara died well over a year after the attack; and there was no evidence presented or doctor's testimony regarding the cause of death.  In response, the circuit court noted that Tara was in a coma, suffered from head injuries, had to be taken to a Florida nursing home, and would not have died but for Phillips' conduct.  Following the

(. . .continued)

before her death, with the further inference that Tara was presumably readmitted before her death.

restitution hearing, the court issued an Amended Judgment of Conviction and Sentence, which ordered Phillips to pay $6,530 in restitution.

On January 20, 2012, Phillips filed a timely notice of appeal from the amended judgment of conviction.

### C.    Intermediate Court of Appeals

Phillips contended to the ICA that his rights under the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Hawai'i Constitution were violated when the circuit court denied his motion to suppress.  Phillips argued that the circuit court erred in applying the plain view doctrine to the discovery of the hammer and in concluding that the State had presented clear and convincing evidence that the clothing was admissible under the inevitable discovery exception to the exclusionary rule.  Finally, Phillips argued that the circuit court erred in assessing $6,530 in restitution.

### 1.    The Hammer

Phillips asserted that the plain view doctrine was inapplicable to the seizure of the hammer, and he argued that the circuit court should have instead applied the open view doctrine.  Phillips acknowledged that there "was nothing intrusive about Officer Tokunaga's vantage point because he was permitted to be in [Phillips'] garage by [Phillips] himself." Officer Tokunaga viewed the hammer from a "public vantage

point," and therefore, "the plain view doctrine should not be applied." "Absent a warrant [or] exigent circumstances at the time of its seizure, since the hammer was recovered from a constitutionally-protected location, evidence of the hammer should have been suppressed under the open view doctrine." Phillips argued in the alternative that, under the plain view doctrine, the circuit court should have suppressed the evidence because the discovery was not inadvertent.

In its Answering Brief, the State argued that "discovery and seizure of the hammer was lawful under the 'plain view' exception to the warrant requirement." The State maintained that Officer "Tokunaga's observation of the hammer with a stain that resembled blood in the garage of the residence was an 'inadvertent discovery,'" because an inadvertent discovery is one in which police officers do not "know in advance the location of certain evidence and intend to seize it, relying on the plain view doctrine only as a pretext." The State argued:

> Officer Tokunaga's discovery of the hammer was inadvertent. Here, Defendant had no reasonable expectation of privacy in his garage during a lawful investigation into the circumstances surrounding Tara's injuries initiated by Defendant's 911 call to the police. The police officers did not anticipate the discovery of the evidence until Officer Tokunaga actually observed the hammer.[9]

---

[9] The State acknowledged that "although the United States Supreme Court has eliminated inadvertent discovery as a requirement of the 'plain view' exception, the Hawai'i Supreme Court has declined" to eliminate that

(. . .continued)

The State contended that the police did not know in advance that the evidence would be there; therefore, the observation of the hammer was an inadvertent discovery, and the circuit court properly admitted the hammer into evidence.

In his Reply, Phillips asserted that "both sides have conceded that the issue boils down to whether Officer Tokunaga's discovery of the hammer was 'inadvertent.'" Phillips argued that discovery of the hammer was not inadvertent just because "the police did not know in advance that the evidence would be there." Rather, Phillips maintained that when Officer Tokunaga discovered the hammer, he "was specifically looking for evidence related to the attack on the complainant."

Phillips contended that "police investigation of a crime or [his] house being established as a crime scene" does not constitute "exigent circumstances such that the police could violate [his] constitutional rights." He did not have an "affirmative duty . . . to declare or establish his constitutional right to privacy in his own home." Phillips argued that there "was no evidence or testimony that established exigent circumstances justifying seizure of the hammer. To the

_____

(. . .continued)

requirement in order to prevent "pretextual [A]rticle 1, Section 7 activity." While claiming that the discovery was inadvertent, the State alternatively "urge[d the] appellate court to reconsider Meyer and hold that 'inadvertent discovery' is not a requirement for the 'plain view' exception to the warrant requirement."

contrary, the police could have quite easily secured the residence and obtained a warrant."

### 2. The Clothing

Phillips declared that the circuit court did not conduct an "analysis under the plain view doctrine to attempt to justify the seizure of the clothing." According to Phillips, "the court rejected any application of the plain view doctrine and instead justified the seizure of the clothing under the doctrine of inevitable discovery."

Phillips contested the circuit court's finding "that the search warrant would still have been issued even without information of the illegally obtained evidence." Rather, Phillips argued, the circuit court improperly concluded that the search warrant would have been issued because "the court fail[ed] to cite to any findings of fact in support of this contention." Phillips contended that his position was bolstered by the fact that "despite all of the illegally-obtained evidence and statements, the police still did not feel that probable cause existed to arrest [him] after his interview."

Phillips also argued that, even if the search warrant would hypothetically have issued, the State did not show that the clothing would have still been there when the search warrant was executed. Phillips maintained that, while he did not mean to suggest he had "a right to discard or destroy evidence," the

lower court improperly "concluded that the State demonstrated by clear and convincing evidence that [Phillips] was incapable of retrieving and discarding the clothing from the garbage can" before the search warrant was executed at 7:45 p.m.

The State countered that "the attempted murder of Tara" in the house and the hammer "found in the garage [with] a stain that resembled blood on it" constituted "sufficient probable cause to issue the warrant." The State contended that Phillips could not have removed evidence from his house because, as noted in the Affidavit in Support of Search Warrant, "the vehicle and residence were being secured by the presence of police units on scene." The State therefore maintained that "the circuit court was correct in concluding that 'the clothing . . . would inevitably have been discovered by lawful means.'"

Phillips replied that because "three major bases of the warrant application [were] invalid"--the hammer, the clothes and much of Phillips' statements to the police--"it cannot be assumed that the warrant [was properly] issued or that it would have specified [the trash can] to be searched." Phillips maintained that even "if there did exist sufficient probable cause to issue the search warrant, the State did not show by clear and convincing evidence that the clothing recovered from [Phillips'] home would still have been there." The warrant was not executed until "approximately sixteen hours later," and

there "was no testimony regarding whether the police would have let [Phillips] back into his house after his release from custody."

### 3. Restitution

Phillips argued that because the parties stipulated that Tara's death was "unrelated to the September 3, 2008 attack . . . it must be accepted as fact." Phillips maintained that "Tara died a full eighteen months after the attack." Phillips argued that "[t]he record was completely devoid of any evidence or testimony that her death was the result of the September 3, 2008 attack on her"; therefore, the circuit court erred when it ordered him to pay restitution.

The State responded that the circuit court correctly recognized that "Tara didn't recover from the injuries she sustained as a result of Defendant's attack upon her," "was in a coma and . . . had to be taken to a Florida nursing home, and there died . . . and would not have died but for Defendant's conduct." The State contended that the circuit court properly concluded that there was a nexus between Phillips' conduct and Tara's death, and therefore, it "did not err by ordering Defendant to pay restitution."

In his Reply, Phillips argued that the circuit court "did not rely on any evidence to overcome the stipulated fact that the complainant's death had nothing to do with the attack

on her."  Because the "conclusions by the court did not come from any evidence -- testimonial or otherwise"--Phillips argued that he had "no opportunity to challenge the court's findings through traditional methods of cross examination or lack of foundation," and therefore, the order of restitution was not proper.

### 4. Summary Disposition Order

On August 30, 2013, the ICA issued a Summary Disposition Order (SDO).  The ICA focused on the "inadvertent discovery" requirement for a "legitimate plain view observation."  In determining the meaning of "inadvertent," the ICA relied upon a dictionary definition of inadvertent as "unintentional."  The ICA noted that Officer Tokunaga's supervisor instructed him "to search the premises for the weapon used in the attack" on Tara.  "A warrant certainly could have been obtained to search the premises given that an attempted murder appeared to have taken place there."  Thus, the ICA concluded that "the search and discovery of the hammer were certainly intentional" and, thus, could not "be described as inadvertent."  The ICA held that "the intentional search and seizure of the hammer under the plain view doctrine was not valid" and that "the circuit court erred in not suppressing the evidence of the hammer."  The ICA concluded that the issues

relating to the clothes and restitution were moot, vacated Phillips' conviction, and remanded the case for a new trial.

The dissent to the ICA opinion "agree[d] that the Circuit Court erred in its application of the plain view doctrine, but only because . . . it was mistaken to apply the doctrine at all."  The dissent contended that "Phillips impliedly consented to a routine investigation into the circumstances of the assault, and the seizure of the hammer was thereby justified."

The dissent reasoned that if the inadvertency requirement was held "to equate to intentionality, then, logically, the plain view doctrine can never apply to a seizure of evidence that is discovered during a search intended precisely to turn up evidence of the sort discovered."  The dissent nevertheless avoided "the use of the plain view doctrine entirely" and used implied consent as the "starting point for [the] analysis."  The dissent "would rule that Phillips impliedly consented to [the] investigation" when he "called 911 to report that his wife was attacked, and hastened responding officers into his home."  And "such consent was valid until such time as the initial investigation ceased; he revoked, or limited the scope of, that consent; or he became a suspect."  The dissent noted that "Phillips never evinced any desire to limit

the scope of police activity" and "seemed intent on facilitating the investigation."

The dissent concluded that the facts provided in Detective Sunia's Affidavit, including the lawfully discovered hammer, established probable cause for a search warrant without the inclusion of the clothes discovered by Officer Frank. Further, "[t]he evidence in the record clearly and convincingly establishes that the authorities would not have permitted Phillips to re-enter his house -- a crime scene -- to dispose of anything therein." Thus, in the dissent's view, the circuit court was correct in determining that the clothing would inevitably have been discovered pursuant to the execution of the search warrant.

The dissent also would have affirmed the circuit court's award of restitution, based on the evidence establishing that Tara suffered head injuries, was in a coma after the attack, and later had to be put in a nursing home where she eventually died. Further, the dissent pointed to evidence presented to the circuit court regarding the lethality of her injuries in concluding that Phillips' responsibility for his conduct was not extinguished.

### D.    Application for Writ of Certiorari

### 1.    The hammer

The State argues that the ICA "gravely erred in holding the circuit court was wrong by not suppressing the evidence of the hammer."  The State maintains that the search and seizure of the hammer was legitimate under the implied consent theory, as described by the ICA dissent.  Alternatively, the State argues that the seizure of the hammer was legitimate under the plain view doctrine because the police "did not anticipate discovery of the evidence until Officer Tokunaga actually discovered the hammer"; thus, the "observation of the hammer was an 'inadvertent discovery.'"  The State additionally requests this court to "hold that inadvertent discovery is not a requirement for the plain view exception to the warrant requirement."

In his Response, Phillips contends that the ICA "did not gravely err in concluding the circuit court was wrong by not suppressing evidence of the hammer."  Phillips argues that the seizure of the hammer was improper because Phillips "did not impliedly consent to a search," and implied consent was not established in the evidentiary record because it "was never a consideration, never argued[,] and never even mentioned at the hearings on the motion to suppress."  To decide this case on implied consent, when relevant facts and testimony were not

developed below, "would implicate [Phillips'] due process right to confront the witnesses with respect to the issue of implied consent." Phillips also echoed the ICA's holding that "the discovery of the hammer was not inadvertent because Officer Tokunaga was ordered to search the premises," and therefore, "the search and seizure of the hammer was unconstitutional."

**2. The clothing**

The State contends that the ICA "gravely erred in concluding that respondent's other points on appeal are moot, and thereby fail[ing] to render a decision with regard to the evidence of clothing." The State maintains that "because the circuit court's ruling with regard to the clothing involves an evidentiary issue, it should have been addressed by the ICA majority before it remanded the case for a new trial." The State also asserts that "the circuit court correctly applied the inevitable discovery doctrine" in admitting the clothing into evidence.

In his Response, Phillips agrees with the State that "the ICA majority gravely erred in concluding [Phillips'] other points on appeal are moot," but he argues that "this court should suppress evidence of the clothing and vacate the circuit court's order of restitution." Phillips submits that "the State did not present clear and convincing evidence that [the clothing] would have been inevitably discovered," maintaining

both that the warrant may not have issued absent the hammer and that the State failed to show that the clothing would have remained in the garbage container until the warrant was executed.

### 3. Restitution

The State urges affirmance of the circuit court's order of restitution because there is "a sufficient nexus for the circuit court to order restitution for Tara's funeral expenses."

Phillips responds that the circuit court improperly awarded restitution because the circuit court "did not rely on any evidence to overcome the stipulated fact that the complainant's death had nothing to do with the attack on her."

### III.     DISCUSSION

### A.   Police entry into Phillips' garage

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by the government.  Similarly, article I, section 7 of the Hawai'i Constitution provides that the "right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated."

It is well established that warrantless searches and seizures of items within a constitutionally protected area are "presumptively unreasonable unless there is both probable cause and a legally recognized exception to the warrant requirement." State v. Bonnell, 75 Haw. 124, 137, 856 P.2d 1265, 1273 (1993). However, "before the issue of the 'reasonableness' of the activity is confronted, it must first be determined whether the activity did, in fact, constitute a search and seizure within the scope of the Fourth Amendment" and the Hawai'i Constitution. State v. Kaaheena, 59 Hawai'i 23, 28, 575 P.2d 462, 466 (1978) (emphases added) (quoting Katz v. United States, 389 U.S. 347, 351 (1967)). This is because the Fourth Amendment and article I, section 7 do not apply unless there has been a "search" or a "seizure." 1 Wayne R. Lafave, Search & Seizure § 2.1 (5th ed. 2013) ("The words 'searches and seizures,' . . . are terms of limitation. Law enforcement practices [are not subject to the Fourth Amendment] unless they are either 'searches' or 'seizures.'" (quoting Anthony G. Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349 (1974))). "[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." State v. Stachler, 58 Haw. 412, 416, 570 P.2d 1323, 1326 (1977) (emphases added) (quoting Katz, 389 U.S. at 351).

To determine whether a police entry constitutes a "search" within the meaning of the Fourth Amendment and the Hawai'i Constitution, two tests have emerged: (1) the "Katz reasonable expectation of privacy test," State v. Kender, 60 Haw. 301, 303, 588 P.2d 447, 449 (1978), and (2) the Jones/Jardines trespass-intrusion test, Florida v. Jardines, 133 S. Ct. 1409 (2013); United States v. Jones, 132 S. Ct. 945 (2012).

The Katz doctrine provides that only government intrusions into areas, objects, or activities in which an individual has exhibited a "reasonable expectation of privacy" are searches subject to the protections of the Fourth Amendment. Katz, 389 U.S. at 360 (Harlan, J., concurring). To determine whether a person's expectation of privacy is reasonable, "there is a twofold requirement, first that a person . . . exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as [objectively] 'reasonable.'" Id. at 361 (Harlan, J., concurring); Stachler, 58 Hawai'i at 416, 570 P.2d at 1326.

Of recent vintage is the Jones/Jardines trespass-intrusion test. Jones and Jardines recognized a trespass-intrusion test based on the property-based understanding of Fourth Amendment search and seizure jurisprudence. What unites Jones and Jardines is the bedrock principle that the government

cannot trespass or physically intrude into a constitutionally protected area for the purpose of gaining evidence without complying with the strictures of the Fourth Amendment.  See Jones, 132 S. Ct. at 950—951; Jardines, 133 S. Ct. at 1414—17. Under the Jones/Jardines trespass-intrusion test, the first question is whether there is a trespass or physical intrusion to persons, houses, papers, or effects.  A physical intrusion is the act of "entering without permission."  Black's Law Dictionary 951 (10th ed. 2014).  Second, it must be determined whether the underlying purpose of the police, objectively examined and at the time of the trespass or physical intrusion, is to gather evidence.  See Jardines, 133 S. Ct. at 1415—17. Once both requisites are satisfied, a search under the Jones/Jardines trespass-intrusion test has occurred.  See Jones, 132 S. Ct. at 951 (explaining that a search occurs where there is a "[t]respass . . . conjoined with that what was present here: an attempt to find something or to obtain information"). The inquiry then shifts to whether there is an applicable exception to the warrant requirement that would allow the otherwise unauthorized governmental activity.  See Jardines, 133 S. Ct. at 1415—17; Jones, 132 S. Ct. at 951—53.[10]

_____

[10]    The Jones/Jardines trespass-intrusion test and the Katz reasonable-expectation test are alternative tests.  See Jardines, 133 S. Ct. at 1418 (Kagan, J., concurring).  Hence, in cases where a Fourth Amendment search occurred under one of the tests, there is no need to engage in an
(. . .continued)

## 1. There was no search under the Katz reasonable expectation of privacy test

As stated, under Katz, to determine whether a person's expectation of privacy is reasonable, a person must exhibit an actual (subjective) expectation of privacy, and that expectation must be one that society is prepared to recognize as objectively reasonable.

### a. Subjective expectation of privacy

Turning first to the subjective prong, the determination of whether or a person "exhibited an actual expectation of privacy," State v. Texeira, 62 Haw. 44, 48, 609 P.2d 131, 134 (1980), is through a fact-specific process, "considering all factors on a case-by-case basis," State v. Ward, 62 Haw. 509, 515, 617 P.2d 568, 572 (1980). Here, Phillips called the 911 operator and requested the police and ambulance be sent to his home because Tara had been assaulted and was seriously injured. When police arrived, the garage door was open and the interior of the garage was exposed to public

---

(. . .continued)

inquiry under the other test. See Jardines, 133 S. Ct. at 1417 (declining to use the Katz test because the approach that the Court announced in Jones was found applicable). Conversely, where no Fourth Amendment search is found under one of the tests, the inquiry does not stop there, and the court must determine whether a search occurred under the other test. See Jones, 132 S. Ct. at 953 (stating that where there is no search under the Jones/Jardines test, such as in "[s]ituations involving merely the transmission of electronic signals without trespass," a Katz analysis must be conducted (emphasis added)).

view, including to the police officers who responded to the scene.  Further, Phillips motioned from within the garage for the responding officer to join him inside.  The officer described Phillips' gesture as "[m]ore or less inviting me that, yeah, this is the place you should come, this is the place you should be."  Phillips did not contest that his intent was to invite the officer into the garage.

The record also does not contain any actions or statements by Phillips that would indicate that he expected the garage area to remain private.  To the contrary, until leaving to go to the police station later that morning, Phillips remained with officers of the HPD, primarily in the garage area.  Phillips has not disputed his lack of a subjective expectation of privacy at any point during this case.  Phillips acknowledged this point at the hearing on the motion to suppress, stating that the police were in the garage "because, you know, [Phillips] had called 911 and they were -- they had a right to be there at the time."  Phillips also conceded this to the ICA, stating that "[t]here was nothing intrusive about Officer Tokunaga's vantage point because he was permitted to be in [Phillips'] garage by [Phillips] himself" and that Officer Tokunaga "was allowed to be in [Phillips'] garage."

In sum, Phillips did not exhibit an actual (subjective) expectation of privacy regarding the presence of

police in his garage for the following reasons: Phillips requested the 911 operator to send the police to his home because Tara had been assaulted; when the police arrived, the garage door was open and the interior of the garage was exposed to public view; Phillips invited the police officers to enter the garage; and the totality of his conduct while the police were present.[11]

### b. Objective expectation of privacy

Even if Phillips had exhibited an actual expectation of privacy, it "must be one that society would recognize as objectively reasonable" in order for the constitutional protections against unreasonable searches and seizures to

---

[11] The concurring and dissenting opinion (dissent) makes the accusation that our analysis places on "the defendant . . . an affirmative obligation to establish that he or she did not consent to a search of a constitutionally protected area." Dissent at 3. No such burden is established. As has always been the case, the defendant need only establish that the police breached his or her reasonable expectation of privacy under Katz or that the police engaged in a Jones/Jardines type of prohibited conduct. If a search has occurred, then the State must demonstrate the existence of an exception to the search warrant requirement. In this case, for example, consent would be a possible warrant exception in analyzing whether the seizure of the hammer, the opening of the closed garbage bin in Phillips' garage, and the subsequent seizure of the clothing in the garbage bin were constitutional.

Contrary to the dissent's view, we do not find Phillips' invitation for the police to enter the exposed area of his garage to be the same as the requisite consent needed to authorize the warrantless acts in this case. We therefore analyze the constitutionality of those acts under the plain view doctrine and the doctrine of inevitable discovery. See infra. As to the police officers' entry into Phillips' garage, we do not reach whether an exception to the warrant requirement was present because, at the outset, the relevant circumstances indicate that Phillips did not have a reasonable expectation of privacy in the exposed areas of the garage and that, therefore, the act of entry was not a search.

attach. Bonnell, 75 Hawai'i at 139, 856 P.2d at 1274; Kaaheena, 59 Hawai'i at 28, 575 P.2d at 466. The police did not enter Phillips' garage of their own initiative; rather, they were responding to Phillips' 911 call for police assistance and his gesturing them into the garage. Hence, Phillips' expectation of privacy was diminished. See State v. Lopez, 78 Hawai'i 433, 442, 896 P.2d 889, 898 (1995) (holding that the defendant's expectation of privacy in his home was diminished by permitting entry by the police); United States v. Williams, No. 14-CR-20419, 2015 WL 730098, at *8 (E.D. Mich. Feb. 19, 2015) (holding that when the defendant invited the initial responders into his apartment to tend to his medical needs, he sacrificed much of his expectation of privacy); State v. Pearson–Anderson, 41 P.3d 275, 279 (Idaho Ct. App. 2001) ("[B]y making the 911 call, [the defendant] diminished her reasonable expectation of privacy within her home by summoning police officers to the premises with an implied representation that an emergency was occurring.").

In addition, Phillips' actions demonstrate that he did not take precautions to insure his privacy in the garage. See State v. Holbron, 65 Haw. 152, 154, 648 P.2d 194, 196 (1982) (stating that the determination of whether a defendant has a reasonable expectation of privacy in a particular place depends, in part, on the precautions he or she takes to insure the

preservation of his or her privacy).  Indeed, Phillips allowed

the garage to become the center of activity for the initial

investigation, including the location of Phillips' demonstration

of how the purported assailant gained access to the home through

the malfunctioning garage door.  By knowingly and voluntarily

exposing the interior of his garage to the police, cf. State v.

Dias, 62 Haw. 52, 56, 609 P.2d 637, 640 (1980) ("Conduct open to

view and conversations audible to persons standing outside of a

building constitute activities knowingly exposed to the

public."), and by readily allowing the area to be used by the

emergency responders, any expectation of privacy in the exposed,

visible interior of the garage was not "one that society would

recognize as objectively reasonable."  Bonnell, 75 Haw. at 139,

856 P.2d at 1274; Kaaheena, 59 Haw. at 28, 575 P.2d at 466.[12]  If

Phillips did not wish the garage to be entered into and its

interior observed, he could have kept it closed and secured, or

he could have refrained from motioning for the police to enter

---

[12]    See also People v. Hobson, 525 N.E.2d 895, 898—99 (Ill. App. 1988) (reasoning that the defendant's act of opening the overhead door of his garage indicated that any expectation of privacy he possessed as to the exposed garage was not one that society would recognize as reasonable); Tracht v. Comm'r of Pub. Safety, 592 N.W.2d 863, 865 (Minn. Ct. App. 1999) (entry into open garage for the purpose of knocking on the exposed service door was not a Fourth Amendment search); State v. Akins, No. C4-99-1066, 2000 WL 271986, at *3 (Minn. Ct. App. Mar. 14, 2000) (no search occurred when a police officer, without a warrant, entered an open garage "to talk to a resident who himself is using the garage as a means of access").

and directed them to access his home from another entryway.  Cf.

Dias, 62 Haw. at 56, 609 P.2d at 640.

Therefore, with neither a subjective expectation of

privacy, nor one that society would recognize as objectively

reasonable, the police officers that Phillips summoned into his

garage did not intrude upon Phillips' reasonable expectation of

privacy by entering the garage.[13]  Having found that the police

did "not invade an individual's legitimate expectation of

privacy, 'there is no "search" subject to the Warrant Clause.'"

State v. Meyer, 78 Hawai'i 308, 312, 893 P.2d 159, 163 (1995)

(quoting Illinois v. Andreas, 463 U.S. 765, 771 (1983)).[14]

---

[13]    We do not find, as the dissent contends, that "because Phillips invited police in, no constitutionally regulated search occurred when the police entered Phillips' home and garage."  Dissent at 2.  A search and seizure occurred, which necessitated a warrant or an exception to the warrant requirement, when the police recovered the hammer and clothing and opened a closed receptacle inside the garage.  See infra Part III.B—C.  We hold only that the police officers' act of entering Phillips' exposed garage, upon Phillips' invitation, did not constitute a search.

[14]    The facts of this case similarly do not result in a finding of a Fourth Amendment search or seizure pursuant to the Jones/Jardines trespass-intrusion test.  This case lacks the hallmark facts involved in both Jones and Jardines.  At the threshold, this case does not meet the first requirement of the Jones/Jardines test because there was no trespass or physical intrusion, that is, the act of "entering without permission." Black's Law Dictionary at 951.  Phillips called police dispatch to summon the police to his home and, upon their arrival, affirmatively motioned them to come forward into his garage.

Not only was there an absence of trespass or physical intrusion in this case, but the purpose of the police when they entered Phillips' garage, objectively examined, was not to conduct a search and collect evidence.  Cf. Jones, 132 S. Ct. at 949; Jardines, 133 S. Ct. at 1416. Police entered Phillips' garage to respond to Phillips' report of a crime, to prevent any impediment to the medical responders who were treating Tara, and to assist Phillips or Tara as requested or needed.  Thus, the police officers' act of entering the garage was not a search under Jones and Jardines.  On the other hand, the act of recovering the hammer and the

(. . .continued)

## 2. Prior decisions of this court

Our determination that Phillips did not have a reasonable expectation of privacy in exposed areas of the garage and, thus, that no "search" occurred when the police entered the garage is in accordance with prior decisions of this court.  In State v. Roy, 54 Haw. 513, 510 P.2d 1066 (1973), evidence was gathered by an undercover agent after he was willingly admitted into a home by the resident.  Id. at 514, 510 P.2d at 1067.  No warrant had been obtained by the police.  See id.  In ruling the evidence admissible, this court agreed with the analysis of the Supreme Court in Lewis v. United States, 385 U.S. 206 (1966): "It is unnecessary to determine whether the facts of this case come within one of [the search warrant] exceptions, however, for we hold that [the Officer's] actions did not constitute a search or seizure as regulated by the Fourth Amendment."[15]  Roy, 54 Haw.

_____

(. . .continued)

clothing was a seizure that required a warrant or an exception to the warrant requirement.  See infra Part III.B–C.

     The dissent disagrees with our conclusion that there was no intent to search concurrent with the police's entry, Dissent at 31–32, but the dissent, in support of this contention, points only to portions of the record purporting an intent to search after the police entered the garage.  Cf. Florida v. Jardines, 133 S. Ct. 1409, 1415–17 (describing a search as trespass accompanied by a concurrent intent to gather evidence).

[15]    In Lewis, a defendant invited an undercover agent into his home to sell the officer illegal narcotics.  Lewis, 385 U.S. at 208.  The defendant contended that "any official intrusion upon the privacy of a home constitutes a Fourth Amendment violation."  Id.  In rejecting the defendant's analysis and holding that the entry of the officer into the defendant's home was "no breach of privacy," the Court adopted the following analysis:

(. . .continued)

at 515, 510 P.2d at 1068 (emphasis added).  Under such

circumstances, the Roy court concluded, "No warrant to 'search

and seize' is required . . . ."  Id. at 516, 510 P.2d at 1068

(emphasis added).[16]  "It is clear beyond peradventure . . . that

the Fourth Amendment to the U.S. Constitution . . . does not

prohibit the introduction into evidence . . . [of items]

'seized' by [the officer.]"  Id. at 516—17, 510 P.2d at 1068.

The court reached a similar conclusion under article I,

_____

(. . .continued)

> [T]his case involves the exercise of no governmental power
> to intrude upon protected premises; the visitor was invited
> and willingly admitted by the suspect.  It concerns no
> design on the part of a government agent to observe or hear
> what was happening in the privacy of a home; the suspect
> chose the location where the transaction took place.  It
> presents no question of the invasion of the privacy of a
> dwelling . . . ."

Id. at 212 (emphases added).  Thus, the Court found that under the
circumstances of a willing invitation, the protections of the Fourth
Amendment are not implicated.  Lewis rests upon a determination that the
defendant lacked a reasonable expectation of privacy.

[16]     Under the dissent's approach, which treats entries into homes and
curtilages as searches per se, the undercover agent in Roy would not have
been able to enter the home even upon the willing invitation of the resident.
This is so because consent must be "knowingly, freely and intelligently"
given, State v. Patterson, 58 Haw. 462, 470, 571 P.2d 745, 750 (1977), and
"[c]onsent, based upon . . . material nondisclosures, can hardly be viewed as
either voluntary or intelligent." State v. Quino, 74 Haw. 161, 175, 840 P.2d
358, 364 (1992).  Thus, under the dissent's consent theory, no undercover
police officer will ever be able to enter homes and curtilages without first
disclosing his or her real identity in order to procure voluntary, knowing,
and intelligent consent, rendering undercover operations in homes and
curtilages virtually impossible.  This result plainly contradicts the holding
of Roy.

section 7 of the Hawai'i Constitution.[17]  Id. at 517, 510 P.2d at 1068.

Thus, this court has held that, under the circumstances of an invitation to and voluntary admittance of a government agent into a home by a resident, the protections of article I, section 7 are not implicated as to the entry into the home, because such an entry is not a search in a constitutional sense.  Applying Roy to the present case, it is clear that Phillips invited and willingly admitted police into his garage on the morning of September 3, 2008, and thus, the protections of article I, section 7 were not implicated and the police's entry into Phillips' garage was not a search.[18]

In Lopez, police responded to reports of a home invasion and robbery.  78 Hawai'i at 437, 896 P.2d at 893.  Police arrived while the residents were at home; following an

_____

[17]    Roy references article I, section 5 of the Hawai'i Constitution; article I, section 5 was renumbered to article I, section 7 following the 1978 Constitutional Convention (Ratified November 7, 1978).  State v. Okubo, 3 Haw. App. 396, 399 n.4, 651 P.2d 494, 498 n.4 (1982), aff'd, 67 Haw. 197, 682 P.2d 79 (1984).

[18]    In State v. Davidsen, 129 Hawai'i 451, 303 P.3d 1228 (App. 2013) (mem), the holding of Roy was found to include situations in which the resident is specifically aware that the person he or she has admitted into his or her home is a law enforcement officer.  In Davidsen, police investigating a theft came to a home to investigate the sale of property alleged to have been taken in the theft.  Id. at *1.  The ICA noted that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection," id. at *2 (alteration in original) (quoting Katz, 389 U.S. at 351), and that the resident "no longer maintain[ed] an actual expectation of privacy in those areas" of his home, id. at *3.

"initial investigation," both police and the residents left the home.  Id.  Based on a suspicion that the home invasion and robbery were motivated by illicit drug activity by the residents, the police returned later without permission or obtaining a search warrant and recovered evidence of drugs.  Id. at 438, 447, 896 P.2d at 894, 903.  The drug evidence was ruled the result of an illegal search.  Id. at 447, 896 P.2d at 903.  The State had argued that, based on the 911 call, the residents' reasonable expectation of privacy in their home had been diminished.  Id. at 441, 896 P.2d at 897.  This court partially agreed.

> When the police initially entered the [residents'] home to investigate the robbery that had just taken place, they did so with the [resident's] permission.  Thus, during the course of this initial investigation, the [resident's] expectation of privacy in their home was, as the prosecution contends, "diminished."

Id. at 442, 896 P.2d at 898 (emphases added).  That is, when a resident permits police to enter his or her home to investigate a crime or for other purpose, the resident has not exhibited a reasonable expectation of privacy into areas knowingly exposed, and hence, the police's entry would not qualify, constitutionally speaking, as a search.[19]

---

[19]    However, that expectation "terminated when the police and the [residents] closed the doors and left the . . . residence."  As soon as that occurred, "the [residents'] expectation of privacy in their home was completely restored."  Lopez, 78 Hawai'i at 442, 896 P.2d at 898.  Thus, only following the restoration of the residents' expectation of privacy did police activities implicating article I, section 7 occur:  "We . . . hold that [the officer's subsequent] entrance into the . . . home, whatever the purpose,

(. . .continued)

Thus, these decisions demonstrate that this court will review an expectation of privacy according to the circumstances presented, rather than assume that a reasonable expectation of privacy exists solely based on a location. See Ward, 62 Haw. at 515, 617 P.2d at 572; Stachler, 58 Haw. at 416, 570 P.2d at 1326. Roy and Lopez indicate that a resident, who invites and willingly admits an agent of the government into his or her home, may not claim a reasonable expectation of privacy into those areas knowingly exposed. Here, as in Roy and Lopez, the police were invited by Phillips into the "garage area" through his 911 call, his beckoning of police "to come forward" into the open garage, and his willing admittance of the officers to respond to and investigate the assault on Tara. Thus, the police's act of entering the garage was not a search in the constitutional sense.

B.     **The hammer is admissible under the plain view doctrine**

When "a governmental intrusion does not invade an individual's legitimate expectation of privacy, [then] there is no search subject to the Warrant Clause." State v. Meyer, 78 Hawai'i 308, 312, 893 P.2d 159, 163 (1995) (emphasis added). In this case, when the police officers entered the open garage,

_____

(. . .continued)

over six hours after everyone had left was a search in the constitutional sense." Id.

there was no search, and the police officers were authorized to be where they were. It is important to note, however, that even in cases where no search in the constitutional sense has transpired, seizures of property remain under the restraints of the Fourth Amendment and article I, section 7. Soldal v. Cook Cty., 506 U.S. 56, 68 (1992) ("[S]eizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place."). Hence, the seizure of property inside the garage was valid only if authorized by a warrant or an exception to the warrant requirement. One well-settled exception is the "plain view doctrine," which allows the police to seize evidence or contraband sighted in plain view from a lawful vantage point. State v. Davenport, 55 Haw. 90, 100–01, 516 P.2d 65, 72 (1973) ("So long as the searching officer is in a position where he is lawfully entitled to be, the seizure of any evidence of crime is permissible."); see also 1 Wayne R. LaFave, Search and Seizure § 2.2 (5th ed. 2013). In cases where the police have not invaded an individual's legitimate expectation of privacy and are thus not conducting a search, they are not required to turn a blind eye to obvious signs of criminality; rather, they are empowered to summarily seize such evidence or contraband under the "plain view doctrine."[20] "[O]nce the intrusion is justified, there is

_____

[20] The plain view doctrine is commonly applied in situations when

(. . .continued)

no requirement of exigency for the police to seize evidence in plain view."  Meyer, 78 Hawai'i at 316, 893 P.2d at 167 .

Under the plain view doctrine, there has been neither an "exploration" for a particular item, nor is the particular item "hidden."  Meyer, 78 Hawai'i at 312, 893 P.2d at 163.

> What the "plain view" cases have in common is that the police officer had a prior justification for an intrusion . . . . The doctrine serves to supplement the prior justification -- whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present.

Coolidge v. New Hampshire, 403 U.S. 443, 466 (1971) (emphases added).  Thus, "'plain view observations' do not 'involve a search in the constitutional sense.'"[21]  State v. Wallace, 80 Hawai'i 382, 398, 910 P.2d 695, 711 (1996) (alteration omitted) (quoting Meyer, 78 Hawai'i at 312, 893 P.2d at 163).

The plain view doctrine requires demonstration by the State of three factors for the warrantless seizure of evidence or contraband to be legitimate: (1) prior justification for the intrusion or proof that the government agents were properly in a position from which they can view the area involved; (2)

---

(. . .continued)

police are lawfully engaged in a search pursuant to a warrant.  See, e.g., State v. Wallace, 80 Hawai'i 382, 400, 910 P.2d 695, 713 (1996) (applying the plain view doctrine to justify the seizure of plastic packets observed during a search pursuant to a warrant).

[21]  "A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property."  Horton v. California, 496 U.S. 128, 133 (1990).

inadvertent discovery; and (3) probable cause to believe the item is evidence of a crime or contraband. Meyer, 78 Hawai'i at 314, 893 P.2d at 165; Texas v. Brown, 460 U.S. 730, 736—37 (1983).

### 1. Lawful presence in the area affording plain view

So long as the "police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." Meyer, 78 Hawai'i at 316, 893 P.2d at 167 (quoting Minnesota v. Dickerson, 508 U.S. 366, 375 (1993)).[22]  Thus, because it has been established that police entry into the open garage did not violate Phillips' reasonable expectation of privacy, the police presence in his garage was lawful.

The prior justification for the police presence in his garage on the morning of September 3, 2008, was conceded by Phillips in his opening brief to the ICA: "As to the first factor, there was prior justification for Officer Tokunaga's intrusion as he was allowed to be in [Phillips'] garage."

---

[22]  In cases where there exists an intrusion by law enforcement, that intrusion may be justified for a variety of reasons.  See Davenport, 55 Haw. at 98, 516 P.2d at 71 (police intrusion justified under search warrant); Wallace, 80 Hawai'i at 398, 910 P.2d at 711 (same); State v. Jenkins, 93 Hawai'i 87, 104, 997 P.2d 13, 30 (2000) (search of vehicle trunk based on probable cause); State v. Ogata, 58 Haw. 514, 572 P.2d 1222 (1977) (open view seizure of weapon seen in vehicle incident to valid stop); Meyer, 78 Hawai'i 308, 893 P.2d 159 (entry into vehicle on request of arrestee).

Phillips also conceded this point at the hearing on the motion to suppress: "So in this case we won't deny that . . . [the police] were there because, you know, [Phillips] had called 911 and they were -- they had a right to be there at the time." (Emphasis added).

## 2. Inadvertent discovery

Although the United States Supreme Court eliminated the "inadvertent discovery" element from the plain view exception, Hawai'i retains the requirement as necessary to "prevent[] pretextual article I, section 7 activity." Meyer, 78 Hawai'i at 314 n.6, 893 P.2d at 165 n.6 (adopting Justice Brennan's dissenting opinion in Horton v. California, 496 U.S. 128 (1990)). Justice Brennan explained:

> [W]e accept a warrantless seizure when an officer is lawfully in a location and inadvertently sees evidence of a crime . . . But 'where the discovery is anticipated, where the police know in advance the location of the evidence and intend to seize it' . . . there is no reason why the police officers could not have obtained a warrant to seize this evidence before entering the premises.

Horton, 496 U.S. at 144 (Brennan, J., dissenting) (emphases added) (quoting Coolidge, 403 U.S. at 470). Thus, the purpose of retaining the inadvertent discovery requirement is to ensure that law enforcement officers are not excused "from the general requirement of a warrant to seize if the officers know the location of evidence, have probable cause to seize it, intend to seize it, and yet do not bother to obtain a warrant particularly

describing that evidence."  State v. Cuntapay, 104 Hawai'i 109, 118, 85 P.3d 634, 643 (2004) (emphases added); see also Meyer, 78 Hawai'i at 314 n.6, 893 P.2d at 165 n.6.  "So long as the officer is in a position where the officer is lawfully entitled to be, the seizure of contraband or evidence of crime is permissible."  Davenport, 55 Haw. at 101, 516 P.2d at 72.

It is self-evident that if a law enforcement officer is unaware of the existence of certain evidence or contraband, then that law enforcement officer cannot know its location.  Neither can the officer have probable cause to seize, or intend to seize, such unknown evidence or contraband.  Thus, the "inadvertent discovery" element of the plain view exception to the warrant requirement is satisfied if the law enforcement officer, justifiably present at a given location, is unaware of the existence of such evidence at issue until the moment of the discovery.  It is the uncontroverted testimony of Officer Tokunaga that the hammer was plainly visible in the garage and entirely exposed.  This is confirmed by the photographic evidence provided by the State at the hearing on the suppression motion, which shows a metal hammer with a black handle lying unconcealed on top of a blue cooler along one wall of the garage.

There has been no suggestion that prior to the discovery of the hammer, law enforcement officers were aware of

its existence; that is, the officers did not know the location of a hammer, did not have probable cause to seize a hammer from Phillips' residence, and did not arrive at Phillips' residence intending to seize a hammer. In fact, at the moment before the hammer was discovered, the HPD officers had no reason to suspect that a hammer was in any way involved in the assault on Tara. Officer Tokunaga testified that at the time he found the hammer, he did not know the general facts of the case, nor was any particular person a suspect. Further, Officer Tokunaga found the hammer shortly after his arrival. There is also no suggestion that the seizure of a hammer was made as a pretext in lieu of properly obtaining a warrant. It follows, therefore, that Officer Tokunaga's discovery of the hammer was inadvertent. Once Officer Tokunaga inadvertently saw the hammer from a position that he lawfully held, he was not required to ignore its presence. Davenport, 55 Haw. at 101, 516 P.2d 65, 72.

Indeed, Officer Tokunaga's inadvertent discovery of the hammer was conceded by Phillips at the hearing: "So in this case we won't deny that . . . they discovered the hammer, . . . and that was lawful . . . ." Thus, the second requirement of the plain view doctrine is satisfied.

### 3. Probable cause to believe that the hammer was evidence of a crime

Under the third element of a plain-view seizure, there must be probable cause to believe that the item is contraband or evidence of a crime. Meyer, 78 Hawai'i at 314, 893 P.2d at 165 In the context of a plain-view seizure, "probable cause" means such a state of facts as would lead a person of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion that the inadvertently observed object was contraband or evidence of a crime. See State v. Naole, 80 Hawai'i 419, 424, 910 P.2d 732, 737 (1996).

Probable cause for a plain-view seizure may be established when the incriminating character of the evidence or contraband is "immediately apparent." Meyer, 78 Hawai'i at 316, 893 P.2d at 167. The surrounding circumstances of an observation of an object by police are part of the probable cause determination. Based on Officer Tokunaga's observation of a "spot of blood" on the hammer, it is clear that a reasonable person would believe and entertain a strong suspicion that the hammer was evidence of a crime. The parties do not dispute that the "spot of blood" on the hammer, observed by Officer Tokunaga after the hammer's inadvertent discovery, constituted probable cause to believe that the hammer was relevant evidence. Phillips concedes this point: "As to the third factor [of the

plain view doctrine], there was probable cause to believe [that] the hammer was evidence of a crime as Officer Tokunaga noticed what appeared to be blood on the metal portion of the hammer." Accordingly, because the facts of this case satisfy all three prongs of the plain view doctrine, the warrantless seizure of the hammer was authorized.

### 4. The ICA erred in suppressing the hammer

The ICA's conclusion that "the intentional search and seizure of the hammer under the plain view doctrine was not valid" is analytically flawed. First, as discussed, there was no "search" in the constitutional sense. Although Officer Tokunaga was instructed to "search" for perpetrators or weapons, a "search" in the constitutional sense occurs only when there is a governmental intrusion into a reasonable expectation of privacy, State v. Kender, 60 Haw. 301, 303, 588 P.2d 447, 449 (1978), or a Jones/Jardines trespass or physical intrusion.

Officer Keliinui's colloquial use of the word "search" is not determinative: "When a governmental intrusion does not invade an individual's legitimate expectation of privacy," or when a search under the Jones/Jardines test does not transpire, "there is no 'search' subject to the Warrant Clause." Meyer, 78 Hawai'i at 312, 893 P.2d at 163. Where there is no Fourth Amendment or article I, section 7 search, then inadvertently discovered items in plain view may be seized upon probable cause

to believe that the items are contraband or evidence of a crime. Id. at 314, 893 P.2d at 165. Here, as has been established, there was no search under the Katz reasonable-expectation test or the Jones/Jardines trespass-intrusion test.

Second, the ICA erred in relying on a common dictionary definition of "inadvertent" when the legal concept of "inadvertent discovery" was at issue.[23] This court specifically retained "inadvertent discovery" as a requirement of the plain view doctrine "in order to foster the objective of preventing pretextual article I, section 7 activity." Meyer, 78 Hawai'i at 314 n.6, 893 P.2d at 165 n.6. Thus, in the context of the plain view doctrine, inadvertence does not mean "accidental"; it means that law enforcement officers did not know the location of evidence, did not have probable cause to seize it, did not intend to seize it, and were thus logically unable to "obtain a warrant particularly describing that evidence." Cuntapay, 104 Hawai'i at 118, 85 P.3d at 643.

As Phillips did not hold a reasonable expectation of privacy in his garage during the initial police investigation in the early morning hours of September 3, 2008, and because there was no search under the Jones/Jardines trespass-intrusion test,

---

[23] Unlike the lay meaning of "inadvertent," the legal term "inadvertent discovery" means a "law-enforcement officer's unexpected finding of incriminating evidence in plain view." Black's Law Dictionary (10th ed. 2014).

the police entry into his garage was lawful, and no search in the constitutional sense occurred.  Since the discovery of the hammer was inadvertent and there was probable cause to seize it, its seizure was lawful.  Thus, there was no requirement for the police to have first obtained a search warrant before seizing the hammer.

Further, when performing a lawful search, plain-view seizure of items outside of the scope of the warrant is not precluded by the intentional looking for or examining of items within the scope of the search, provided the other elements of plain view are met.  Compare Wallace, 80 Hawai'i at 399, 910 P.2d at 712 (seizure valid under plain view doctrine where officer, during a valid intentional search of a bag in a car, inadvertently observed contraband contained in clear plastic packets), and State v. Jenkins, 93 Hawai'i 87, 104, 997 P.2d 13, 30 (2000) (gun protruding from a duffle bag legitimately seized after being observed in plain view during a legitimate warrantless search of a car trunk), with Cuntapay, 104 Hawai'i at 118, 85 P.3d at 643 (purported plain-view seizure not proper when police had no prior justification for the intrusion into the washroom, and discovery found not inadvertent because observation of contraband required officer to move a "'washing machine away from the wall in order to closely inspect' the 'evidence that otherwise would not have been visible to

police'"). Indeed, if the inadvertency element of a plain-view seizure required an "accidental" discovery, then the plain view doctrine could never apply to a seizure of evidence that is discovered during execution of a search warrant issued to find unrelated evidence. Such an interpretation has been rejected by this court. Davenport, 55 Haw. at 100, 516 P.2d at 72 (holding that an otherwise permissible search is not rendered unlawful merely because a different contraband is discovered than what was listed in the warrant).

Thus, the ICA's application of the plain view doctrine was flawed for the following reasons: article 1, section 7 of the Hawai'i Constitution was not offended by the police entry into Phillips' garage during the initial investigation into the assault of Tara on the morning of September 3, 2008; no search in the constitutional sense occurred as a result of the observation of the hammer; and the definition of inadvertent discovery, as an element of a plain-view seizure, is provided by our case law, and reliance on a dictionary was not necessary. As a result, the ICA gravely erred in suppressing the hammer.

C.    **The clothing was inevitably discovered**

As already noted, the facts and circumstances of this case manifest that Phillips did not possess a reasonable expectation of privacy in the exposed interior of his garage, nor did the police officers' entry into the garage constitute a

search pursuant to the Jones/Jardines trespass-intrusion test.
Hence, the police were authorized to enter the garage; however,
Phillips' invitation to enter in no way authorized the police to
summarily open closed receptacles inside the garage and seize
evidence hidden from plain view.  The instant the police engaged
in such activities, a search and seizure in a constitutional
sense occurred, the validity of which required either a valid
warrant or an exception to the warrant requirement.  The circuit
court in this case determined that the police would have
inevitably discovered the clothing found inside the garbage
bin.[24]  Under the inevitable discovery rule, evidence obtained in
violation of article I, section 7 of the Hawai'i Constitution may
be admitted as evidence at trial if the State presents clear and
convincing proof that the evidence would inevitably have been
discovered by lawful means.  State v. Lopez, 78 Hawai'i 433, 451,
896 P.2d 889, 907 (1995).  Thus, the inevitable discovery
exception hypothesizes that the evidence subject to the
exclusionary rule would have been found through legal means
independent of the unlawful seizure.  Id.

---

[24]     By applying an exception to the exclusionary rule, the circuit
court implicitly concluded that Officer Frank's discovery of the clothing in
the garbage bin violated article 1, section 7 of the Hawai'i Constitution.
See State v. Tanaka, 67 Haw. 658, 661, 701 P.2d 1274, 1276 (1985) (concluding
that a reasonable expectation of privacy exists in a closed garbage bag).

The hypothetical situation in this case is the warrant that was subsequently issued to the police after the clothing had already been discovered and seized. Two issues are therefore germane: first, whether there was probable cause for the issuance of a warrant even without statements unlawfully obtained from Phillips and any information derived from the clothing found inside Phillips' garbage bin, and second, whether the clothing would have been found pursuant to that warrant. See State v. Sepa, 72 Haw. 141, 144, 808 P.2d 848, 850 (1991) (holding that a warrant based on an affidavit containing material misstatements could nonetheless establish probable cause if "the affidavit's content, with the false material omitted, is sufficient to establish probable cause"); Lopez, 78 Hawai'i at 447—48, 896 P.2d at 903—04 (stating that "a search warrant is not constitutionally defective because it is based, in part, on illegally seized evidence where sufficient probable cause exists to issue the warrant without relying on the suppressed evidence").

Turning to the first issue, a search warrant must always be predicated "upon a finding of probable cause supported by oath or affirmation." State v. Navas, 81 Hawai'i 113, 116, 913 P.2d 39, 42 (1996). "Probable cause exists when the facts and circumstances within one's knowledge and of which one has reasonably trustworthy information are sufficient in themselves

to warrant a person of reasonable caution to believe that an offense has been committed." Id.

An affidavit in support of a finding of probable cause should "set forth 'some of the underlying circumstances' from which the police concluded that the objects sought to be recovered were where they claimed they were, and disclose some of the underlying reasons from which the affiant concluded that the information was 'reliable.'" Sepa, 72 Haw. at 143—44, 808 P.2d at 850 (quoting State v. Kanda, 63 Haw. 36, 620 P.2d 1072 (1980)). The determination of whether probable cause supported the issuance of a search warrant is reviewed de novo under the right/wrong standard of review. Navas, 81 Hawai'i at 123, 913 P.2d at 49.

The Affidavit that Detective Sunia submitted in support of her application for a search warrant stated that Phillips told responding officers that he left his residence and went for a ride in his car because he could not sleep. Phillips told Officer Collins that before leaving his residence, he closed the garage door but left the door leading into the kitchen from the garage unlocked. Detective Sunia emphasized in her Affidavit that this was inconsistent with Phillips' account of the events to Officer Ahn. Phillips told Officer Ahn that he left the garage door open when he left. There was no indication of forced entry.

Tara sustained a massive blunt force trauma to her head, was in critical condition, had a broken wrist, and had some of her fingernails ripped off.  A bloody footprint was present on the sheet covering the bed in which Tara was found.  There was blood splatter on the walls of the bedroom in which Tara was found, but there was no indication of any transfer of large amounts of blood on the stairs or other rooms in the residence.

Police officers found a hammer lying by the garage door, and Phillips admitted that he owned that hammer.  The hammer found in the garage had traces of what appeared to be dried blood.

Phillips informed one HFD firefighter that he had been arguing with Tara earlier, before he left for a drive.  One of the children informed Officer Rivera that, on September 3, 2008, Tara and Phillips had been arguing "because [Phillips was] texting other women and cheating on [Tara]."  A neighbor stated that, on September 1, 2008, at around 10:00 a.m., "he heard people arguing inside" the residence and that, on September 3, 2008, at around 3:30 a.m., "he heard a loud thumping sound coming from the residence . . . , as if someone had fallen down the stairs."  The search warrant application was further supported by Detective Sunia's statement in her affidavit that based on her experience, training, and qualifications, homicide

suspects use their vehicles and personal property, including bags, pouches, and closed containers, to conceal instrumentalities utilized in the commission of the crime. See State v. Groves, 65 Haw. 104, 114, 649 P.2d 366, 373 (1982) (relying on a police officer's experience and expertise to establish probable cause); accord State v. Chong, 52 Haw. 226, 231—32, 473 P.2d 567, 571 (1970).

The circuit court found that the foregoing facts constituted clear and convincing evidence that, even if illegally obtained statements and information relating to the discovery and seizure of the clothing were redacted from the affidavit, probable cause existed to justify the issuance of a warrant. We conclude that the circuit court did not err in determining that these facts would have produced in the mind of a reasonable person a firm belief that a criminal offense was committed in Phillips' house and against Tara. See Lopez, 78 Hawai'i at 454 n.30, 896 P.2d at 910 n.30.

The second issue--whether the clothing would have been found pursuant to the warrant--in turn has two components: whether the scope of the warrant would have allowed the police to discover and thereafter seize the clothing, and whether the circumstances are such that the clothing would still have been in the garbage bin after the police secured and thereafter executed a search warrant.

As to scope, the search warrant authorized the police to search "the . . . residence as well as <u>any and all closed containers</u> contained within, which are currently secured and being watched by an officer with the Honolulu Police Department." (Emphasis added). Further, the warrant permitted the police to search and seize "all items of evidence, including, but not limited to physical, transfer, and trace evidence (personal property and/or biological evidence), which would tend to establish the identi[t]y of the person(s) occupying the vehicle and/or residence, and which may include . . . <u>articles of clothing</u>." The scope of the warrant thus provided clear and convincing evidence that the police would have discovered the clothing in the garbage bin once the warrant was executed.

As to whether the clothing would still have been in the searched premises when the warrant was executed, the affidavit expressed that the residence was "being secured . . . by the presence of police units on scene" and was "unoccupied and within an enclosed area, inaccessible to members of the public." The affidavit also stated that closed containers within the residence were "currently secured and being watched by an officer with the Honolulu Police Department." These facts indicate that nobody, not even Phillips, was allowed to access or occupy any part of Phillips' residence, and a police officer

was standing guard while a warrant application was being prepared for the examination and approval of a judge.  Hence, there is no merit in Phillips' argument that he could have returned to his residence and tampered with the clothing between the time when he left the police station and the execution of the warrant, thereby precluding the inevitable discovery of the clothing.

The circuit court thus concluded, and we agree, that the government satisfied its "burden to show by clear and convincing evidence that the clothing found within a covered trash container in the garage would inevitably have been discovered . . . under the authority of the September 3, 2008, search warrant covering the residence and its garage and any containers located therein."

D.    **The dissent misapprehends and misapplies the Katz reasonable expectation of privacy paradigm**

For the dissent, any entry by the police into a home or its curtilage is a search under the Katz reasonable expectation of privacy test, requiring consent (an exception to the warrant requirement) in order to pass constitutional muster. Dissent at 18—24.  This is true even in cases where the interior of that area has been knowingly exposed for anyone to view, the police were invited there by the resident, and the police purpose upon entry is not to gather evidence.  The dissent

effectively creates a per se rule that would find any entry, including those elicited by an invitation, into a home or its curtilage as a search.

Further, the dissent reasons that the invitation by the resident to the police to respond to an emergency or a report of suspected criminal activity constitutes an implied consent for the police not only to enter the home but also "to a brief initial search of the premises to determine whether there were other victims or perpetrators present at the scene." Dissent at 2.

According to the dissent's summary of its recommended test,

> when a defendant calls the police to a place in which he/she has a reasonable expectation of privacy, and the defendant reports that a crime has been committed there, he/she consent to a brief search of the premises by the police so that the police can secure the location and determine whether there are other possible victims or perpetrator(s) present at the scene. The defendant's consent, however, does not extend to a wholesale search of the premises such that the police are then free to go through bathroom and kitchen cabinets, personal effects, or closed containers.

Dissent at 29—30. Thus, this "consent" to search applies automatically to a place where the caller has a reasonable expectation of privacy.

The dissent's approach is fundamentally flawed for four reasons: (1) it is inconsistent with the precept that a search in the constitutional sense does not arise solely based on the nature and character of the area upon which the police

intrusion is directed; (2) it is not supported by precedent; (3) it flows from the emergency exception to the warrant requirement that Hawai'i has never adopted; and (4) it is contrary to the fundamental tenets of the consent doctrine.

### 1. Protections Afforded by the Fourth Amendment and Article I, Section 7 Do Not Automatically Attach Based on the Place Involved

The Supreme Court, and later this court, "rejected the idea that some areas are automatically accorded constitutional protection while others are not." State v. Stachler, 58 Haw. 412, 416, 570 P.2d 1323, 1326 (1977); State v. Kaaheena, 59 Haw. 23, 26 & n.4, 575 P.2d 462, 465 & n.4 (1978) (recognizing that pursuant to Katz, traditional constitutionally protected areas, such as homes, are "no longer afforded automatic constitutional protection"); Katz v. United States, 389 U.S. 347, 351 (1967). This rejected idea, however, forms the very basis for the dissent's creation of a per se rule that a person always has a reasonable expectation of privacy in his or her home and its curtilage.

The dissent thus rejects the long-established principle that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Stachler, 58 Haw. at 416, 570 P.2d at 1326 (quoting Katz, 389 U.S. at 351). By adhering to the view that any entry into a home or its curtilage--even those whose

interior has been knowingly exposed to the public--is a search,

the dissent also discredits the practice in this jurisdiction to

engage in a case-by-case consideration of different factors in

the course of determining whether a search has occurred within

the meaning of the Fourth Amendment and article I, section 7.

State v. Ward, 62 Haw. 509, 515, 617 P.2d 568, 572 (1980).[25]  The

determination of whether a search in a constitutional sense has

transpired does not depend solely on the nature and character of

the area upon which the police intrusion is directed, but it is

informed by the confluence of relevant circumstances bearing

upon the determination of whether a person has a reasonable

expectation of privacy in an area or whether a Jones/Jardines

type of prohibited conduct has occurred.  Id.  The manifest

flaws in the dissent's search doctrine are underscored by its

determination that despite Phillips having called the police to

his home because of an assault on Tara that resulted in serious

injuries, despite the garage door being open and its interior

exposed to the public, despite Phillips having invited the

police to enter his garage, and despite the record not

containing any actions or statements by Phillips indicating that

---

[25]     The dissent claims that its proposed analytical framework is the
"unanimous approach" followed by other jurisdictions.  Dissent at 2.  But see
supra note 12.  In any event, the holdings of the cases that the dissent
cites do not stand for the proposition that any police entry into a home or
its curtilage is per se a search in the constitutional sense.  See infra Part
D.2.

the garage area was private, the dissent concludes that Phillips had a reasonable expectation of privacy in his garage.  Such an approach would leave very little, if anything, remaining of a meaningful Katz analysis.[26]

### 2. Supreme Court precedents do not support the dissent's analysis

The dissent asserts that its approach flows directly from Mincey v. Arizona, 437 U.S. 385 (1978); Flippo v. W. Virginia, 528 U.S. 11 (1999) (per curiam); and Thompson v. Louisiana, 469 U.S. 17 (1984) (per curiam).  Dissent at 25—26. The fundamental issue in these cases was the validity of the police's reentry into homes after the exception that legitimized their initial entry had expired.  See Mincey, 437 U.S. at 391—92; Flippo, 528 U.S. at 11, 13—14; Thompson, 469 U.S. 17, 18-19, 21—22.  None of these cases involved a home or its curtilage that its owner or resident knowingly exposed to public view to such an extent that a reasonable expectation of privacy in the area would be found lacking.[27]  Additionally, none of these cases

---

[26]    The dissent makes the assertion that our application of the Katz and Jones/Jardines tests results in the evisceration of privacy rights. However, we simply apply Katz, as that case has been understood since its inception, and Jones/Jardines to the facts of this case.  Our continued application of the Katz and the Jones/Jardines tests yields only the conclusion that the entry of the police, pursuant to a resident's invitation, to knowingly exposed premises is not a search.  However, a subsequent seizure or search, including the exploration of concealed areas and closed containers, must be authorized by a warrant or an exception to the warrant requirement.

[27]    The same is true for the state appellate cases from which the dissent extracts its proposed analytical framework.

held that mere physical entry, upon a resident's invitation, into knowingly exposed premises automatically constitutes a search for which a warrant or an exception to the warrant requirement is mandatory.[28]  Hence, these cases do not support the dissent's position.

Further, in each of these cases, the Supreme Court found that the limits of the States' "emergency" exception had been exceeded, impelling the need for a warrant (or a recognized exception to the warrant requirement) to legitimize the ensuing general exploratory search by the police.  Mincey, 437 U.S. at 392; Flippo, 528 U.S. at 14; Thompson, 469 U.S. at 22.  Hawai'i

---

[28]    In Mincey, the officers gathered evidence for four days,

> during which period the entire apartment was searched, photographed, and diagrammed. The officers opened drawers, closets, and cupboards, and inspected their contents; they emptied clothing pockets; they dug bullet fragments out of the walls and floors; they pulled up sections of the carpet and removed them for examination.  Every item in the apartment was closely examined and inventoried, and 200 to 300 objects were seized.

Mincey, 437 U.S. at 389.  In Flippo, the police reentered a cabin where a crime was apparently committed and, in the course of approximately sixteen hours, "took photographs, collected evidence, and searched through the contents of the cabin."  Flippo, 528 U.S. at 12.  In Thompson, the investigators conducted a general exploratory search for evidence of a crime and examined each room of the residence involved.  Thompson, 469 U.S. at 18-19.

State v. Patterson, 58 Haw. 462, 468, 571 P.2d 745, 749 (1977), the sole Hawai'i case that the dissent relies upon, also does not support the dissent's approach.  In that case, this court did not hold that mere entry into the defendant's home was a search in the constitutional sense.  Id. at 467, 571 P.2d at 748.  Further, the fact that no search was found to have been conducted when the police entered the defendant's home upon the defendant's invitation is consistent with our conclusion in this case that the police did not engage in a search when they entered the exposed interior of Phillips' garage on Phillips' invitation.

has not considered whether article I, section 7 encompasses an emergency exception to the warrant requirement. Consequently, there has been no occasion for this court to determine the limitations of such an exception as set forth in Mincey, Thompson, and Flippo.

While consent is a recognized exception to the search warrant requirement, an exception is relevant only if there was a Fourth Amendment search.[29] In this case, because Phillips did not have a reasonable expectation of privacy in the exposed interior of his garage, the police officers' entry into the garage did not constitute a Fourth Amendment search. Thus, as to the police officers' entry, it is not appropriate to evaluate the applicability of a warrant exception.

### 3. The dissent's approach is a relabeling of the emergency exception to the warrant requirement

The "consent" search that the dissent proffers, allowing police called to a place to search for victims or

---

[29] Other jurisdictions, based on an emergency response at a home, have employed an implied consent analysis. See McNair v. Virginia, 521 S.E.2d 303 (Va. Ct. App. 1999) (defendant impliedly consented to a police search of his home after having called for an emergency response to his home due to a robbery); State v. Dowling, 387 So. 2d 1165 (La. 1980) (defendants impliedly consented to police search of home after having called an emergency response to their home to investigate a shooting). However, as noted, Hawai'i has not addressed whether article I, section 7 encompasses an emergency exception; thus, we have had no reason to apply an implied consent doctrine to justify police entry into a home. Instead, Roy, Lopez, and Davidsen have found police entry into a home lawful when the particular circumstances of the case demonstrate that the resident lacked a reasonable expectation of privacy.

perpetrators, originates from Mincey, which held that in instances where someone is in need of immediate aid or in homicide crime scenes, "the Fourth Amendment does not bar police officers from making warrantless entries and searches" and allows the police to "make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises." Mincey v. Arizona, 437 U.S. 385, 392 (1978); see also Thompson v. Louisiana, 469 U.S. 17, 21 (1984); Flippo v. W. Virginia, 528 U.S. 11, 14 (1999) (per curiam). The dissent appropriates the Mincey victim-or-perpetrator search, which is predicated on an emergency exception to the warrant requirement, as the allowable scope of the "consent" search that may be conducted at a home or its curtilage by virtue of a person's call for the police to respond to an apparent crime scene. Thus, the dissent advocates adoption of an emergency exception to the warrant requirement, which this court has never accepted and which neither party raised, under the guise of the consent exception.

This observation is further supported after examining the state appellate cases that the dissent relies upon. Those cases allow police officers called to respond to an apparent crime scene to search the premises to the extent reasonably related to the routine investigation of the offense and the identification of the perpetrator. See State v. Fleischman, 157

Ariz. 11, 15, 754 P.2d 340, 344 (Ct. App. 1988); State v. Brady, 585 So. 2d 524, 529 (La. 1991); State v. Dowling, 387 So. 2d 1165, 1169 (La. 1980); State v. Fredette, 411 A.2d 65, 69 (Me. 1979). The dissent, however, abandons the holdings of these cases as to the allowable scope of a consent search and instead suggests that the search should be limited to a Mincey victim-or-perpetrator search. Consequently, the dissent conflates the consent and emergency exceptions, each of which is distinct from the other, in order to create a framework that has never been adopted or utilized in this jurisdiction.

### 4.    The dissent's approach disregards the fact-intensive nature of consent

Even if one were to accept the dissent's consent-based approach, it is beyond question that the validity of consent is "determined from the totality of circumstances surrounding the defendant's purported relinquishment of a right to be free of unreasonable searches and seizures." State v. Russo, 67 Haw. 126, 137, 681 P.2d 553, 562 (1984). The dissent's approach, on the other hand, does away with the case-by-case, fact-specific determination that always accompanies the analysis of both the validity and scope of consent searches. According to the dissent, in every case in which a person calls the police to respond to a home or its curtilage because of an apparent crime, the person has effectively consented for the

police to search the premises for the purpose of identifying other victims or finding whether the perpetrator is still present. Dissent at 20—24, 29—30. Thus, the dissent crafts an approach that preordains both the validity and scope of one's consent based singularly on the fact that the occupant of a home or its curtilage has called the police to respond to an apparent crime, to the exclusion of all other facts and circumstances. This approach is in contravention of well-settled canons that have guided courts for decades whenever consent searches are at issue. See Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973) (explaining that the validity of consent is assessed by "the totality of all the surrounding circumstances" and enumerating several factors that may be taken into account in the analysis); State v. Won, 137 Hawai'i 330, 340, 372 P.3d 1065, 1075 (2015) ("In Hawai'i, consent is measured under an analysis examining the totality of the circumstances."); State v. Russo, 67 Haw. 126, 137, 681 P.2d 553, 562 (1984) (accord); State v. Merjil, 65 Haw. 601, 605, 655 P.2d 864, 868 (1982) (accord).

Additionally, this court is not in a position to determine as a matter of law the presence and scope of consent when it was not litigated in the trial court.[30] Whether consent

---

[30] Also notable is that neither party raised the applicability of the doctrine of consent to the facts of this case, and hence, this issue is not properly before this court. State v. Moses, 102 Hawai'i 449, 456, 77 P.3d

(. . .continued)

to search has been given voluntarily under the totality of all the circumstances is a question of fact to be determined by the trial court. State v. Patterson, 58 Haw. 462, 468, 571 P.2d 745, 749 (1977). Consent means that acquiescence to the government's search must be "in fact, free[] and voluntar[y]." Nakamoto v. Fasi, 64 Haw. 17, 21, 635 P.2d 946, 951 (1981).

On appellate review, the findings of a trier of fact regarding the validity of a consent to search must be upheld unless clearly erroneous. State v. Ganal, 81 Hawai'i 358, 368, 917 P.2d 370, 380 (1996). Here, however, the trier of fact made no determination regarding the existence or validity of consent to a search because consent was never argued at the motion

---

(. . .continued)

940, 947 (2003) ("As a general rule, if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal; this rule applies in both criminal and civil cases." (citing State v. Ildefonso, 72 Haw. 573, 584, 827 P.2d 648, 655 (1992))). Thus, in order for this court to reach this issue, it would have to be noticed as plain error. While it is accepted that an appellate court may affirm a lower court's judgment on any ground in the record supportive of affirmance, see State v. Dow, 96 Hawai'i 320, 326, 30 P.3d 926, 932 (2001), to uphold the circuit court's ruling as to Phillips' motion to suppress unlawful seizure of evidence upon a theory never presented "would raise serious questions of due process." United States v. Parrilla Bonilla, 648 F.2d 1373, 1385-86 (1st Cir. 1981); see Cole v. Arkansas, 333 U.S. 196, 202 (1948) ("To conform to due process of law, petitioners were entitled to have the validity of their convictions appraised on consideration of the case as it was tried and as the issues were determined in the trial court."). Notably, Phillips did not testify at the motion hearing and at the trial. Arguably, however, if the issue of implied consent were raised as a legal theory that justified the police conduct in this case, Phillips would have been called to testify as to his actions and the voluntariness of his purported consent in order to refute its existence, validity, or scope. Accordingly, as Phillips aptly contends, by affirming the circuit court's motion to suppress ruling based upon a fact-driven theory that was neither raised in nor considered by the circuit court, the dissent effectively deprives Phillips of the right to meet and defend against allegations of implied consent, raising "serious questions of due process."

hearing or in the trial court.  Thus, in the absence of any consideration or a finding by the trial court regarding consent, the dissent's determination that the consent exception to the warrant requirement applies to the factual circumstances of this case is contrary to the approach of our prior holdings.

If the dissent were to duly apply the doctrine of consent as an exception to the warrant requirement, its determination would require vacating that portion of the order denying Phillips' suppression motion and remanding the case to the circuit court for a determination of whether consent had, "in fact, [been] freely and voluntarily given."  Patterson, 58 Haw. at 468, 571 P.2d at 749 (1977); see, e.g., State v. Kaleohano, 99 Hawai'i 370, 56 P.3d 138 (2002) (holding that remand was necessary to give the trial court the opportunity to make specific findings on voluntariness because deciding the issue on appeal without such findings amounts to the usurpation of the factfinder's role).[31]  Thus, this court can affirm or vacate a finding of free and voluntary consent to a search, but it should not make a determination of consent without providing an opportunity to the parties to provide testimony upon the

_____

[31]    See also Thompson, 469 U.S. at 23 (in response to arguments that the search should be upheld as consensual, stating, "Because the issue of consent is ordinarily a factual issue unsuitable for our consideration in the first instance, we express no opinion as to whether the search at issue here might be justified as consensual."); Flippo, 528 U.S. at 15 (making the same response to arguments that the search could be upheld under an implied consent theory).

issue of consent and without allowing the trial court to make relevant factual findings.

In Russo and Nakamoto, consent was argued at the trial court, and the appellate courts' review considered the factual determinations.  By contrast, the analysis of the dissent would provide as a matter of law that the facts of this case implies the consent of a resident to a search of his or her garage for the purpose of searching other victims or the perpetrator; this approach is inconsistent with our prior decisions holding that consent is a question of fact.

### E.    Restitution

As a result of the injuries sustained in the attack, Tara was in a coma when she was admitted to the hospital on the morning of September 3, 2008.  Although she regained consciousness, she was never able to live on her own after the attack.  No evidence at trial or sentencing was presented regarding any preexisting conditions or subsequent injuries or illnesses that may have caused her death.

The State requested that Tara's mother be reimbursed for funeral and related expenses.  Phillips argued that he should not be liable for any additional payment because he had made "very large payments for a couple years to" Tara's mother, Tara died well over a year after the attack, and there was "no evidence presented . . . no doctor's testimony" regarding the

cause of death; consequently, he also requested a reduced amount of restitution.[32]

The circuit court found that Tara "was in a coma," suffered from "head injuries," "had to be taken to a Florida nursing home, and there died. . . . She would not have died but for his conduct."  Based on its finding of a nexus between Phillips' actions and Tara's death, the circuit court awarded restitution for funeral expenses under HRS § 706-646.[33]  The ICA did not reach this issue, having ordered suppression of the hammer, remanding the case for retrial, and declaring all other points on appeal moot.

HRS § 706-646 requires a court to order restitution for "losses suffered by the victim or victims as a result of the defendant's offense."  A party's conduct "is a legal cause of

---

[32]    Phillips also argues that the parties' stipulation that Tara's death was unrelated to the attack prevents an award to Tara's mother to recover funeral related expenses.  However, the parties' stipulation to a fact for purposes of trial does not supersede the court's responsibility to independently determine a relevant factual issue in assessing the applicability of restitution as part of sentencing.  A court's determination of a fact at sentencing, for example, may be premised upon evidence adduced at sentencing that was not introduced at trial.  Consequently, the sentencing court was not bound by the trial stipulation.

[33]    HRS § 706-646 (2013) provides, in relevant part:

(2) The court shall order the defendant to make restitution for reasonable and verified losses suffered by the victim or victims as a result of the defendant's offense when requested by the victim. . . .

(3) . . . Restitution shall be a dollar amount that is sufficient to reimburse any victim fully for losses, including but not limited to . . . [m]edical expenses [and] [f]uneral and burial expenses incurred as a result of the crime."

harm to another if . . . his conduct is a substantial factor in bringing about the harm." Knodle v. Waikiki Gateway Hotel, Inc., 69 Haw. 376, 390, 742 P.2d 377, 386 (1987) (quoting Restatement (Second) of Torts § 431 (Am. Law. Inst. 1965)). The conduct "need not have been the whole cause or the only factor . . . bringing about the . . . plaintiff's injuries," id. (quoting Mitchell v. Branch, 45 Haw. 128, 132, 363 P.2d 969, 973 (1961)), but some "nexus" is required in order to award restitution under HRS § 706-646. State v. Domingo, 121 Hawai'i 191, 195, 216 P.3d 117, 121 (App. 2009) (holding that where nexus was lacking, restitution could not be imposed).

To determine whether a sufficient nexus exists for the application of HRS § 706-646, a court must determine whether the evidence supports a finding that the defendant's conduct was the cause of or aggravated the victim's loss. Id. at 195, 216 P.3d at 121 ("Absent evidence that [defendant's] conduct caused or aggravated [victim's] injuries or caused [victim's] death, no causal relationship between [defendant's] criminal act and a victim's losses is shown and restitution may not be imposed pursuant to HRS § 706-646.").

A constitutionally valid sentence is reviewed for a plain and manifest abuse of discretion. State v. Kumukau, 71 Haw. 218, 227, 787 P.2d 682, 686 (1990). In this case, the evidence at trial and at sentencing plainly demonstrated a

sufficient nexus between Phillips' attack on Tara and her subsequent death, providing the requisite basis for the circuit court to order restitution for Tara's funeral-related expenses. Thus, the circuit court's award of restitution was not an abuse of discretion.

## IV.     CONCLUSION

Analysis under our search and seizure jurisprudence proceeds in a logical manner, and the proper starting point for a search and seizure analysis is whether a constitutionally proscribed search occurred. A search in the constitutional sense occurs when, under Katz, the government invades a person's reasonable expectation of privacy or when, under Jones and Jardines, the government physically intrudes--that is, enters without permission--a constitutionally protected area for the purpose of collecting evidence. Here, the police officers that Phillips summoned into his garage did not invade any reasonable expectation of privacy. Further, police did not physically intrude into Phillips' garage with the intent to gather evidence. Because there was no search related to the entry of the garage, exceptions to the search warrant requirement, such as consent, are not pertinent to the analysis.

While the police were lawfully in the garage conducting their initial check of the residence following a reported home invasion and a brutal assault, the hammer was

observed by HPD officers in plain view, and there was probable cause to seize it. Thus, the hammer was recovered as a valid plain-view seizure. With respect to the clothing, there was clear and convincing evidence that it would have been inevitably discovered under the authority and scope of the search warrant that the police later obtained that day; thus, the warrantless seizure of the clothing from the inside of the closed garbage bin within Phillips' garage was lawful.

Lastly, because there was a sufficient nexus between Phillips' actions and the expenses incurred by Tara's family, the circuit court did not err in its restitution order.

Consequently, the ICA Judgment on Appeal is reversed, and the circuit court's amended judgment of conviction is affirmed.

Stephen K. Tsushima                    /s/ Sabrina S. McKenna
for petitioner

                                       /s/ Richard W. Pollack
Randall K. Hironaka
for respondent                         /s/ Rhonda A. Nishimura

